## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH DELSARDO, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION a/k/a THE NCAA, THE AMERICAN ATHLETIC CONFERENCE f/k/a THE BIG EAST CONFERENCE, THE ATLANTIC COAST CONFERENCE, and THE UNIVERSITY OF PITTSBURGH<br><br>*Defendants*. | Case No. 2:21-cv-213<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Joseph Delsardo ("Plaintiff" or "Mr. Delsardo") brings this Class Action Complaint and Demand for Jury Trial, on behalf of himself and those similarly situated, against the University of Pittsburgh ("Pittsburgh"), American Athletic Conference (the "AAC" or "former Big East"), the Atlantic Coast Conference (the "ACC"), and the National Collegiate Athletic Association ("NCAA") (collectively, "Defendants") to obtain redress for all persons injured by Defendants' reckless disregard for the health and safety of Pittsburgh student athletes. Plaintiff alleges as follows:

### INTRODUCTION

1.    Approximately one-hundred (100) years ago, medical studies first revealed that athletes who endured repeated head contact risked long-term brain damage.

2.    Numerous subsequent medical studies established that the head trauma routinely inflicted in football games can cause neurocognitive decline, permanent mental disability and death.

3.      Plaintiff is a former college football player seeking to represent a class of other similarly situated student-athletes ("Players") who suffered concussive and sub-concussive head injuries while participating in football games and practices at the University of Pittsburgh.

4.      The NCAA was created to protect the students that participate in various college sports, including football. Despite its alleged purpose, the NCAA has failed to take reasonable actions to protect Players from the chronic risks created by such injuries and fraudulently concealed those risks from Players.

**A.  NCAA's SYSTEMIC EXPLOITATION**

5.      Most student-athletes are teenagers when they start playing college football. Many cannot afford the price of college tuition. The NCAA exploited, and continues to exploit, the ignorance and lack of finances of the student-athletes that agree to play college football.

6.      Through the allure of becoming a professional athlete (collegiate football essentially operates as a minor league to the NFL) and by way of offering a "free education" (not always free).

**B.  NCAA's PROFITEERING OFF OF UNPAID, AMATEUR LABOR**

7.      Historically, the NCAA and participating universities have conspired for their significant financial gain to the detriment of student-athletes, consistently opposing student-athletes' attempts to receive compensation for their work and prohibiting students' from licensing their likeness and image.



8.   The NCAA, participating universities and conferences have a financial incentive for prohibiting players from compensation and had the same incentive when it ignored the health risks associated with playing college football.



9.   Defendants concealed the devastating impact playing college football has on the Players, including the increased risk of brain injuries, memory loss, dementia, depression,

3

Chronic Traumatic Encephalopathy ("CTE"), Parkinson's disease, anxiety and other related symptoms.

10.    Most of the brain injuries occur years after Players stopped playing college football and will continue to be felt as a result of permanent neurological damage from concussive and sub-concussive injuries.

11.    For nearly four (4) decades, the NCAA knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries ("traumatic brain injuries" or "TBIs") that resulted from playing college football, but actively concealed this information to protect the profitable business of college football.

12.    Pittsburgh student-athletes are under the care of their institution and its staff. Because the Defendants cared more about profits and the outcome of games over the health of its players, Plaintiff and the class he seeks to represent are going suffer neurological injuries for the rest of their lives.

13.    Despite years of proof that football causes neurological injuries, as well as the extent of brain damage caused by concussive and sub-concussive hits, Defendants continued not to inform the players they had a duty to inform. Defendants knowingly made the decision to prioritize football over player health and safety.

14.    As a direct result of Defendants' actions (or lack thereof), Plaintiff and a Class of former players (defined below) now suffer from neurological and cognitive damage, including symptoms of traumatic encephalopathy.

## **PARTIES**

15.    Plaintiff Joseph Delsardo is a citizen of the State of New York and a resident of New York County.

16.   Defendant University of Pittsburgh is a university located at 4200 Fifth Avenue, Pittsburgh, Pennsylvania 15260. Defendant Pittsburgh is authorized to conduct, and does conduct, business throughout this District, the State of Pennsylvania, and the United States.

17.   Defendant American Athletic Conference, formerly the Big East, is a collegiate athletic governing body with its principle office located at 15 Park Row West, Providence, Rhode Island 02903. Defendant AAC oversees twelve member institutions in nine states, including Pennsylvania. Defendant American Athletic Conference is authorized to conduct, and does conduct business in this District, the State of Pennsylvania, and the United States.

18.   Defendant Atlantic Coast Conference is a collegiate athletic governing body with its principle office located at 4512 Weybridge Lane, Greensboro, North Carolina 27407. Defendant ACC overseas fifteen member institutions in ten states, including Pennsylvania. Defendant ACC authorized to conduct, and does conduct business in this District, the State of Pennsylvania, and the United States.

19.   Defendant National Collegiate Athletic Association is an unincorporated association with its principal office located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is authorized to conduct, and does conduct, business throughout this District, the State of Pennsylvania and the United States.

## JURISDICTION AND VENUE

20.   This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2) Class Action Fairness Act because (i) the aggregate value of the amount in controversy exceeds the sum or value of $5,000,000.00, (ii) there is minimal diversity of citizenship between Plaintiff and Defendants, and (iii) the Class consists of more than 100 members.

21.    Additionally, this Court has jurisdiction because of complete diversity among the parties and the amount in controversy is above $75,000.00 pursuant to 28 U.S.C. § 1332.

22.    This Court has personal jurisdiction over Defendants because they intentionally avail themselves of the rights and privileges of conducting business in the State of Pennsylvania, have continuous and systematic contacts with the State of Pennsylvania, and the injuries giving rise to the claims herein occurred in the State of Pennsylvania.

23.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 as the events and conduct giving rise to the claims occurred in this District, and because Defendants: (i) are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of their service in this District, (ii) do considerable business in this District, and (iii) are subject to personal jurisdiction in this District.

## FACTUAL BACKGROUND

### I.    The NCAA, AAC, ACC, and the University of Pittsburgh Had a Duty to Protect Their Student-Athletes.

24.    The NCAA's governance structure consists of numerous committees composed of representatives from its member institutions.

25.    Schools are divided by competitive ability into three divisions. The "best" division is Division I. This is the highest level of intercollegiate athletes sanctioned by the NCAA and includes well-known schools, higher ranked teams, larger budgets, better facilities, and more athletic scholarships. Pittsburgh's football program is a Division I program.

26.    The NCAA itself divides into multiple conferences. These conferences are often regionally designed to facilitate play between similar schools. Defendant American Athletic Conference, formerly known as the Big East, was established in 1979. The American Athletic

6

Conference promulgates rules, handbooks, and regulations for its member organizations in order to regulate its member institutions athletic departments. Each member institution, and each of the member institution's athletes, agree to abide by the rules and regulations issued by the NCAA and their respective athletic conference.

27.     Pittsburgh became a member of the Big East (now the American Athletic Conference) in 1991, and remained with the conference until joining the Atlantic Coast Conference (ACC) in 2013.

28.     Pittsburgh's football program has a strong following which generates millions of dollars per year for the school. The home stadium for the University of Pittsburgh seats over 60,000 thousand fans. Given its significant following and numerous on-field successes, Pittsburgh's football team attracts top talent from high schools around the country and has produced a number of professional players and Football Hall of Fame inductees.

29.     The University of Pittsburgh, the AAC, the former Big East, the ACC, and the NCAA were collectively tasked with overseeing the health and wellness of each student-athlete.

30.     One of the original purposes of the NCAA was league oversight and player safety. However, student-athlete safety, particularly in football, has been problematic for the NCAA as far back as the early 20th century. After an alarming amount of players died or were severely injured, United States President Theodore Roosevelt convened a summit to help save the game from its gravest workplace threat: neurological injury.

31.     Though the NCAA's alleged primary focus may be improving player safety (and the NCAA is empowered to penalize schools for non-compliance with safety standards), the NCAA gives broad discretionary power to the member schools to implement their own plans for player safety. The NCAA Constitution sets forth:

### 2.2.3 Health and Safety.

It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

32.     The NCAA's annual production of a "player safety guide" for collegiate football offers articles and loose guidelines on improvements in player safety.

33.     The NCAA holds itself out as the sole authority on player health, safety and governance. Schools and athletic conferences turn to the NCAA for leadership on player issues, only to be met with clauses such as 2.2.3 (Above) that diffuse responsibility.

34.     As such, the member conferences within the NCAA are tasked with much of the responsibility to oversee that its schools address player health. The former Big East had a duty to ensure the health and safety of Pittsburgh football players.

35.     The member institutions, including The University of Pittsburgh, are inherently dichotomous places for the aforementioned issues related to health concerns. College football programs are focused, above all, on winning games, even at the cost of player health and safety. Although teams do address player health concerns, the culture of football is such that injuries are considered part of the game.

36.     Although the NCAA's founding was predicated on the basis of player safety, the conferences and member institutions play a significant role in player health and safety oversight. Yet, schools like The University of Pittsburgh, do not take player health seriously.

37.     As the governing institutions tasked with overseeing NCAA player health and safety, former Big East conference, the AAC, the ACC, and The University of Pittsburgh possessed superior knowledge on player health (specifically neurological injury) that was

withheld from their student-athletes, including Plaintiff and the putative class.

## II.    The Affects of Concussion Related Injuries are Well Documented

38.    Neurological impacts can cause concussion, a heightened risk of TBI's, Chronic Traumatic Encephalopathy (CTE), Alzheimer's disease, chronic Migraine headaches, Parkinson's disease, and other related symptoms. Neurological injury can also lead to mental and cognitive impairment, including anxiety, memory loss, dementia, depression.

39.    Impacts to the head affect the brain, regardless of whether it is formally diagnosed as a concussion. A player who has experienced sub-concussive hits can chronically accumulate similar damage to the brain of his concussed teammate.

40.    In football, TBI's are caused by both concussions and sub-concussive (slightly less impactful) hits. These injuries are caused by a rattling of the brain; the brain itself smashes against the sides of the skull, causing damage and sometimes internal bleeding. The sensitivity of the brain, which is composed of soft tissue and protected by a pool of spinal fluid, is so great that even minor contact to the head can cause an impact strong enough to result in a concussion.

41.    Currently, there are between 40 and 50 consensus-based definitions of a concussion.[1] Generally stated, a concussion is when the brain hits against the side of the skull hard enough to cause damage or bleeding.

42.    The acceptance of the existence of concussions in the medical community is firmly rooted. American Board of Psychiatry and Neurology certified neurologist Dr. Kerasidis recently stated, "Whenever I hear 'concussion needs more research,' I have mixed

---

[1] Dominick Mastrangelo, "*Sidelined: Student-Athletes balance health with competitive nature of sports.*" Central Michigan Life: Online Magazine, (Oct. 8, 2015).

feelings, because not only is it true but misleading… The truth is we know a lot about

concussion injuries, and certainly enough to aid in prevention, detection, and recovery."

43.     When an athlete experiences a concussive blow to the head, symptoms

are identified as follows:

- feeling dazed, dizzy, or lightheaded, "getting your bell rung" or "seeing stars";

- immediate short-term memory loss;

- flu-like symptoms, including nausea or vomiting;

- headaches and migraine headaches;

- photosensitivity and blurred vision;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance;

- feeling anxious or irritable for no apparent reason; or

- feeling overly tired.

44.     Concussions can also be asymptomatic. Some athletes do not feel any

symptoms, even though their brain has been badly injured. Thus, athletes frequently put

themselves at risk of further injury by returning to a game after an undiagnosed concussion.

45.     Athletes returning to the field of play after an undiagnosed concussion is

extremely dangerous, and yet very common at NCAA schools, including Pittsburgh.

46.     After a concussion, the brain is particularly sensitive. During recovery, the brain

is highly vulnerable to "Second-Impact Syndrome," or SIS, an exacerbation of the previous

concussion leading to a worsening of symptoms and recovery time because of a newly

sustained concussion. Athletes who suffer this second concussion or neurological injury while attempting to recover from a concussion can risk immediate and permanent brain damage.

47.    Thus, it is vital for an athlete who may have sustained a concussion to be immediately removed from the field of play for a long enough time to heal properly.

48.    As a result of the brain's sensitivity post-concussion, neurologists generally prohibit individuals from returning to any normal activities— especially those that would leave the patient vulnerable to SIS—until all symptoms have subsided.

49.    As brains and damage sustained differ so drastically, the length of the healing process varies amongst individuals. Symptoms can last a few hours or several weeks.

50.    When a concussion does not heal within a few months, the injured person can be diagnosed with a different, but related ailment, "Post-Concussion Syndrome." The symptoms of Post-Concussion Syndrome can last for months and in some cases can be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

51.    Many people think of concussions as short-term, temporary injuries, but scientific research demonstrates that the effects of concussions are anything but temporary.

52.    Although medical research proving neurological damage as a result of concussions has been available for nearly a century, much of the prevailing research is recent.

53.    In Pittsburgh, in the early 2000's, a forensic pathologist named Dr. Bennett Omalu discovered that concussions and years of sub-concussive hits triggered the release of plaque-like "Tau" proteins in the brain of former NFL players. Dr. Omalu's research was shunned and rejected by the NFL and the football community. His autopsies on former

Pittsburgh Steelers Mike Webster and Justin Strzelczyk led to the first formal diagnosed cases of CTE.

54.    According to Dr. Omalu, precursors of CTE include erratic, inexplicable and violent behavior, major clinical depression, anxiety, and dementia. Dr. Omalu now believes that more than 90% of former NFL players suffer from CTE.

55.    Today, the people involved in professional and amateur football have begun to reevaluate many of the concerns that arise due to neurological injuries. Some in the industry have even changed their opinions of the effects of the game on the health of its players.

56.    On May 24, 2016, NFL General Manager Doug Whaley of the Buffalo Bills stated that he thinks humans "aren't supposed to play football… it's a violent game."

57.    The United States Congress has even been forced to address the issue of concussions in sports, slamming the NFL in a May 2016 investigation for their attempts to influence the National Institute of Health's studies on football-caused concussions and neurological injury. Before many of the concussion issues became public knowledge, the NFL had been funding the NIH's studies and concussion research. Congress' 96 page report included details of the NFL threatening to cut off funding to the NIH if they did not assign NFL-friendly doctors to the research.

58.    While Defendants knew or should have known the harmful effects of neurological injury to student-athletes, they ignored these facts and failed to institute meaningful methods to protect the student-athletes, including Plaintiff and the putative class.

III.    **By Concealing the Dangers of Concussions and Refusing to Implement Reasonable Concussion Management Protocols, the NCAA, American Athletic Conference, the former Big East Conference, the Atlantic Coast Conference, and The University of Pittsburgh Breached Their Duties to**

**Their Student-Athletes**

59.    Despite Defendants' awareness of the impact of concussions and sub-concussive hits, Defendants failed to take decisive action to address this epidemic. Instead, they actively concealed this information from the student-athletes who relied on the institution to oversee their own safety.

60.    The NCAA first acknowledged the existence of danger associated with concussions in 1994 in their annual player safety handbook. Rather than offering guidelines or procedures on how to help address a player with a concussion or neurological injury, the NCAA's 1994 provision merely diffused responsibility to the schools. Concussion protocols were to be at the discretion of teams and their doctors.

61.    This guideline acted as a way for the NCAA to shield itself from liability while enabling its lucrative revenue generating football programs to continue.

62.    This provision also indicates the NCAA's knowledge of the danger of concussions but its unwillingness to share that information with the athletes they were tasked to protect.

63.    Although the NCAA, former Big East, the AAC, the ACC, and member schools were all aware of the devastating harm caused by concussions, they failed to adopt universal protocols to address concussion management until 2010 (nearly 100 years after the first concussion research was written).

64.    The 2010 policy requiring schools to have a "Concussion Management Plan" or CMP, stated in relevant part:

> A student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions" and that the player "shall not return to activity for the remainder

of that day.

65.    However, this policy has not been adhered to by the member schools, and has not been enforced by the NCAA or the conferences that oversee each of the schools.

66.    As a result of the NCAA's diffusion of responsibility and allowing the schools to maintain autonomy over concussion-related practices, the NCAA's guidelines have been seen as suggestive rather than binding and enforceable.

67.    Defendant's interest in protecting the health and safety of players is supposed to be akin to the responsibilities of a custodial relationship. NCAA student athletes are almost exclusively between the ages of 18 and 23, a key developmental period in the life of any young adult. Defendants have failed in that capacity and acted in their own self-interest, rather than the interest of the players, suppressing vital information that undoubtedly would have affected the value of collegiate football.

68.    In the end, these still deficient policies were implemented too late for Plaintiff and the putative class, who suffered reasonably foreseeable harm as a result of the actions taken by the NCAA, former Big East, and Pittsburgh.

## PLAINTIFF JOSEPH DELSARDO

69.    Plaintiff Joseph Delsardo played collegiate football from 2004-2006 at the University of Pittsburgh in Pennsylvania.

70.    Before playing for Pittsburgh, Delsardo had an illustrious high school career at Seton LaSalle Catholic High School in Pittsburg, PA. Delsardo was named to the Associated Press' Small School All-State Team (first team); Pittsburge Post-Gazette WPIAL Class AA Player of the Year; Pittsburgh Tribune-Review WPIAL Class AAPlayer of the Year, Pittsburg Post-Gazette 'Fabulous 22,' Pittsburgh Tribune-Review 'Terrific 25,'

and three-time All-Century Conference. In high school, Delsardo also played basketball, tennis, and bowling.

71.     Over the course of his collegiate football career, Delsardo was frequently exposed to both concussive and sub-concussive hits that left him vulnerable to a Traumatic Brain Injury.

72.     While attending and playing for Pittsburgh, Delsardo received head-to-head contact (which is banned by the NCAA due to its propensity to cause concussions) in nearly every full practice and game during his three (3) years at Pittsburgh.

73.     Delsardo suffered undiagnosed concussions and sub-concussive hits numerous times in practice, resulting in dizziness, [stars and memory loss throughout.

74.     While attending Pittsburgh, Delsardo experienced memory loss during practice.

75.     As a result of the culture at the Defendant's institution, Delsardo felt that the school's prioritization of a "win-first" mentality over player health meant that he needed to keep playing despite his obvious neurological impairment.

76.     At all times during the career of Delsardo's collegiate football career, the NCAA still had not mandated the creation of Concussion Management Plans. Thus, the member institutions were solely responsible for the oversight of players with neurological injury. Rather than remove a player who told his coach that he had sustained memory loss, Pittsburgh pressured Delsardo back onto the field of play.

77.     Further, no medical tests were ever conducted in relation to Delsardo's memory loss incident, and he was never again asked about this injury by anyone at Pittsburgh.

78.     Accordingly, each time Delsardo suffered a concussive or sub-

concussive hit, he immediately returned to the field of play.

79.     Delsardo, like many collegiate football players, continued to play despite his injuries because his socio-economic status dictated the necessity of playing professional football.

80.     Each time Delsardo suffered a concussive or sub-concussive hit, he was deprived by Defendants of the appropriate medical attention and treatment that they knew, or should have known, was necessary to monitor, manage, and mitigate risks associated with TBI.

81.     During that time, Delsardo was subjected to repeated head impacts and TBI in practices and games, and suffered several concussions as result.

82.     As a result, Plaintiff Delsardo now suffers from anxiety, migraine headaches, memory loss, and other debilitating injuries.

## **CLASS ACTION ALLEGATIONS**

83.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of himself and a Class defined as follows:

> **Class**: All individuals who participated in the varsity football program between 1952 through the present

Plaintiff Delsardo brings this action pursuant to Federal Rule of Civil Procedure Rule 23(b)(3) on behalf of himself and Subclass defined as follows:

> **Big East Subclass**: All individuals who participated in a football program within this conference between 1990 and the present.

> **Atlantic Coast Conference Subclass**: All individuals who participated in a football program within this conference between 1990 and the present.

> **American Athletic Conference Subclass**: All individuals who participated in a football program within this conference between 1990 and the present.

84.     The following people are excluded from the Class and Subclass (collectively,

referred to as the "Class", unless otherwise indicated): (1) any Judge or Magistrate presiding

over this action and members of their families; (2) Defendants, Defendants' subsidiaries,

parents, successors, predecessors, and any entity in which the Defendants or their parents have a

controlling interest and its current or former employees, officers and directors; (3) persons who

properly execute and file a timely request for exclusion from the Class; (4) persons whose

claims in this matter have been finally adjudicated on the merits or otherwise released; (5)

Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and

assigns of any such excluded persons.

85.     **Numerosity**: The exact number of the members of the Class is unknown and

not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable.

On information and belief, hundreds of collegiate football players fall into the definition of

the Class. Members of the Class can be identified through Defendants' records.

86.     **Commonality**: There are many questions of law and fact common to the

claims of Plaintiffs and the Class, and those questions predominate over any questions that may

affect individual members. Common questions for the Class include, but are not limited to the

following:

        (a)     Whether Defendants' conduct as alleged herein
                        constitutes negligence;

        (b)     Whether Defendants' conduct as alleged herein
                        constitutes fraudulent concealment;

        (c)     Whether Defendants' conduct as alleged herein
                        constitutes a breach of express contract;

        (d)     Whether Defendants' conduct as alleged herein
                        constitutes a breach of implied contract;

(e)     Whether Defendants' conduct as alleged herein
constitutes unjust enrichment at the expense of Plaintiffs
and the Class;

(f)     Whether Defendants had a duty to adequately warn and
educate players about the dangers and symptoms of
concussions and concussion-related brain injuries;

(g)     Whether Defendants had a duty to enact rules and
procedures to protect players from sustaining concussions
and concussion-related traumatic brain injuries;

(h)     Whether Plaintiff and the Class are entitled to equitable
relief, including actual and compensatory damages, and
other injunctive relief.

87.     **Typicality**: Plaintiff's claims are typical of the claims of other members of the
Class, as Plaintiff and other members sustained damages arising out of the wrongful conduct
of Defendants based upon the same negligent conduct.

88.     **Adequate Representation**: Plaintiff will fairly and adequately protect the
interests of the Class and have retained counsel competent and experienced in complex
litigation and class actions. Plaintiff has no interest antagonistic to those of the Class, and
Defendants have no defenses unique to Plaintiff.

89.     **Predominance and Superiority**: Class proceedings are superior to all other
available methods for the fair and efficient adjudication of this controversy, as joinder of all
members is impracticable. The damages suffered by the individual members of the Class are
relatively small in comparison to the burden and expense of individual prosecution of the
complex litigation necessitated by Defendants' actions. It would be virtually impossible for the
members of the Class to obtain effective relief from Defendants' misconduct on an individual
basis. Even if members of the Class themselves could sustain such individual litigation, it
would not be preferable to a class action, because individual litigation would increase the delay

18

and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**<u>NEGLIGENCE</u>**

90.     Plaintiff on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

91.     The NCAA was originally founded to assume the duty of protecting the health and safety of all student-athletes at member institutions. The NCAA also assumed a duty of care when they it began taking steps to combat concussions and protect the health and safety of players. The NCAA assumed this duty by creating manuals and regulations to improve player safety.

92.     Defendant AAC, the conference formerly known as the Big East, shared this same duty to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up- to-date guidance and regulations to minimize the risk of injury to football players.

93.     Defendant ACC shared this same duty to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up- to-date guidance and regulations to minimize the risk of injury to football players.

94.     Defendant The University of Pittsburgh assumed similar duties to its football players, including Plaintiff and the putative class.

95.     As Pittsburgh was closest in proximity to the individual wellness of each player,

it held a unique responsibility of directly assuring that each player received the medical attention needed upon exhibiting concussion-like symptoms.

96.     Defendants all held a role in caring for the health, safety and well-being of collegiate football players such as Plaintiff and the putative class.

97.     Defendants NCAA, AAC, and ACC's responsibilities included educating Pittsburgh and its football players on the prevention, treatment and dangers of repetitive sub-concussive and concussive injury.

98.     The NCAA's duty, extended to the AAC and ACC, further included a duty to warn students of the risks associated with football before, during, and after they played college football and as additional information came to light.

99.     As such, all of the Defendants had a duty not to conceal material information from The University of Pittsburgh football players, including Plaintiff and the putative class.

100.     Specifically, Defendants breached their duties to the Plaintiff by withholding information, failing to properly warn against the dangers of concussion-related injury, and failing to properly protect Plaintiff and the putative class.

101.     Evidence of the NCAA's non-disclosure of this vital information can be proved through the organization's commissioned study on injuries to collegiate soccer players in 1988. Although not football players, the NCAA's collection of recorded concussion data and 17 mentions of concussions in this study prove the NCAA's knowledge of the existence and danger of concussions.[2]

---

[2] Margot Putukian, et. al, "*Descriptive Epidemiology of Collegiate Men's Soccer Injuries: NCAA Injury Surveillance System, 1988-1989 through 2002-2003.*" Journal of Athletic Training (Online), (2007).

102.    In the past, the NCAA has attempted to shield itself from liability by asserting that only a "single-sport" class would be certified. The NCAA's anticipation of these class actions often leads to their attempt to dismiss information pertinent to other sports; however, the NCAA's general lack of institutional control pertaining to concussions is pervasive and illuminated by their unwillingness to collect data specific to football.

103.    Further, The University of Pittsburgh breached its duty by encouraging players to return to the field of play when injured, and to create culture around the game of football that embraces head-to-head (or helmet-to-helmet) contact.

104.    Plaintiff understandably and reasonably relied on the medical instructions of the University of Pittsburgh. Because the universities, conferences and NCAA have superior knowledge about the effect of TBI's, Plaintiff relied on this knowledge with the understanding that the Defendants had a duty to protect him from foreseeable injury.

105.    Defendants had an obligation to the Plaintiff and the putative class to provide adequate healthcare regardless of how difficult it may be to diagnose an ailment sans symptoms. This difficulty does not discharge the Defendants' responsibility from addressing each concussion as seriously and steadfastly as a player who may have broken a bone on the field.  Defendants had a responsibility to be prepared for any foreseeable injury of their student-athletes and the foreseeability of concussions in football is clear.

106.    Today, the causal impact of football-related neurological injury is well known. Although TBI may not present itself as obviously as a broken arm, a capable neurologist can readily diagnose many of these issues so long as the player has the opportunity to see a neurologist. For example, Chronic Traumatic Encephalopathy (CTE) is a terminal illness exacerbated by dementia and can only be diagnosed post-mortem; this has been known since

2002. Yet, although there are no current ways to diagnose the disease, the symptomology is so

unique it can often be diagnosed just from knowing that the patient experienced concussion(s)

or sub-concussive hits.

107.    Absent Defendants' negligence, the risks of harm to Plaintiff would have been

materially lower, and Plaintiff would not have sustained the brain damage from which he

currently suffers.



**NCAA School Defense Attorney Admits:**

**Q: Do you feel like school districts and athletic department officials are being unfairly targeted with litigation? In what respect?**

**A:** Not always. If a player is truly returned to play when that player is symptomatic from a head injury, and that player then suffers a resultant injury, someone likely acted in a negligent matter.

Steven Pachman

108.    The increased risk of harm to Plaintiff caused by the Defendants has resulted in

tangible injury to the Plaintiff and the putative class. Plaintiff has suffered damages as a result

of Defendants' negligence, including but not limited to, permanent brain damage, terminal

illness, emotional distress, past and future healthcare costs, homecare and nursing care

expenses, lost time and future earnings, as well as a loss of consortium to their spouses and

families.

109.    Plaintiff, individually and on behalf of the Class, seeks actual damages for

Defendants' negligence, as well as interest, reasonable attorneys' fees, expenses, and costs.

**SECOND CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**

110.    Plaintiff on behalf of himself and the proposed class, repeats and realleges all

preceding paragraphs as if fully set forth herein.

111.    Defendants have known that concussions, sub-concussive hits, and repeated

blows to the head can cause neurological injury.

112.    Scientific and medical studies have shown the existence of TBI as a result of contact sports as far back as the 1920's in boxing. Increased technology and medical advances since that date have added to the composite of neuroscience research regarding concussions.

113.    Defendant NCAA passively issued guidelines about the existence of concussions in the early 1990's, but underplayed the dangers of neurological injury. Further, the NCAA delegated this highly important duty to schools, who were both unwilling and unequipped to fully address the concussion issue.

114.    Through a concealment of these material facts, Defendants created a false belief held by the Plaintiff that: a) concussions and sub-concussive hits were not as dangerous as they should have been portrayed to be; and b) they would be cared for in the event of the injury out of the duty that the Defendants had to the Plaintiff.

115.    Further, the NCAA had a duty to warn its member institutions and conferences about the dangers of concussions so that there would be policies in place regardless of what the NCAA dictated or added to its constitution. The NCAA failed in this duty and/or falsely represented the effects of neurological injury and the impact it could play in the future lives of players.

116.    This concealment of material facts directly led to Plaintiff's exposure to danger after suffering a concussion, because for the first 90+ years of the NCAA's existence, there were no rules mandating the removal of a player who may have suffered a concussion. Thus, for nearly a century, the withholding of this vital information has led to consummate exposure of the Plaintiff to significant injury, such as SIS and Post-Concussion Syndrome. Both of these syndromes have the potential to be fatal.

117.    Had the Defendants chosen to present the concealed information to the Plaintiff and the Class, there is a strong likelihood that they would have acted differently. These material facts on concussion research could have prevented many players from reentering the field of play post-concussion, led to protocols ensuring that players could not resume physical activity until cleared by neurologists, and even prevented some players from playing the game of football altogether.

118.    Defendant's knowledge, concealment of that knowledge and/or intentional blindness, and ineffectual efforts to promote a culture of player-safety all contributed to the injuries sustained by the Plaintiff and putative class.

119.    Plaintiff, individually and on behalf of the Class, seeks actual damages for Defendants' fraudulent concealment, as well as interest, reasonable attorneys' fees, expenses, and costs.

## THIRD CAUSE OF ACTION
## BREACH OF EXPRESS CONTRACT
## BETWEEN THE PLAYERS AND NCAA

120.    Plaintiff on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

121.    Football players attempting to play at institutions governed by the NCAA are required to sign a 'sports participation' contract. This contract outlines the duties and obligations that each of the parties have to each other.

122.    One duty outlined in the contract addresses the coordination of player health and safety. The relevant portion sets forth:

       (a)  conducting intercollegiate athletics "in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes," NCAA Const., Art. 2, § 2.2;

(b) requiring that "each member institution [] protect the health of, and provide a safe environment for, each of its participating student-athletes," NCAA Const., Art. 2, § 2.2.3; and

(c) requiring that "each member institution must establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience." NCAA Const., Art. 2, § 2.2.

123.    Upon signing this agreement, Plaintiff Delsardo and the Class agreed to each of the terms put forth by the NCAA.

124.    Plaintiff Delsardo and the Class have each fulfilled their obligations to the NCAA as established in these 'sports participation' contracts.

125.    Defendants failed to meet the obligations they agreed to in these contracts. Specifically, the above portions which address player health and safety were breached.

126.    As such, the NCAA breached the contract by concealing or failing to disclose what knowledge they had that pertained to concussions and neurological injuries. The NCAA agreed to provide a safe environment for which student-athletes could participate in athletic competition, and failed to do so.

127.    Plaintiff Delsardo also entered into an agreement to play football at the University of Pittsburgh. In this agreement, Plaintiff agreed to attend as a student and to comply with all relevant rules.

128.    One such rule sets forth that [the University of Pittsburgh must]:

(a) Conduct the  football program in a manner
designed to protect and enhance the physical and educational well-being of Plaintiffs and other student football players; and

(b)  Require that the football program furnish a safe environment
for Plaintiffs and all of the program's participants.

25

129.    Whereas the Plaintiff, as well as the Class, complied with their obligations Pittsburgh failed to do the same.

130.    As a result of Pittsburgh's non-compliance with its own contract, Plaintiff and the Class suffered, and continue to suffer, from real and imminent injury.

131.    Plaintiff, individually and on behalf of the Class, seek actual damages for NCAA's contractual breaches, as well as interest, reasonable attorneys' fees, expenses, and costs.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS CONTRACT
## BETWEEN THE NCAA AND UNIVERSITIES

132.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

133.    To the extent that no express or implied contract is found to exist between Plaintiff and Defendants, an express contract existed between the NCAA, Pittsburgh, the ACC, and the AAC. Under the terms of that contract, the contracted parties agreed to abide by the applicable NCAA rules and regulations, including those expressly set forth in the NCAA's Division Manuals, Constitution, and Bylaws.

134.    Under the terms of that contract, as set forth in the NCAA Constitution and encompassed within the NCAA Division Manuals, the contracting parties and NCAA agreed to, among other things: (1) "conduct[] [intercollegiate athletic programs] in a manner designed to protect and enhance the physical and educational well-being of student athletes"; and (2) "protect the health of and provide a safe environment for each of its participating student-athletes."

135.    Plaintiff and the Class are the intended third-party beneficiaries of the contract between Defendants. Such an intention can be found in the express language of the NCAA's rules and regulations, as well as the stated purpose and principles of the NCAA organization.

136.    Defendants breached the contractual duties owed to Plaintiff and the Class under the contract by failing to implement or require rules of play and return to play criteria to minimize or prevent the risk of concussions and concussion-related injuries.

137.    Defendants further breached their contractual duties by failing to adequately educate student-athletes on the symptoms of concussions and concussion-related injuries.

138.    Defendants further breached the contract by failing to inform student-athletes on the long term injuries resulting from concussions.

139.    As a direct result of Defendants' breach, Plaintiff and the Class suffered physical injury and damages in the form of past, ongoing, and future medical expenses, and other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by the breaching parties conduct.

140.    As a result of their misconduct, Defendants are liable to Plaintiffs for the full measure of damages allowed under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for Defendants contractual breaches, as well as interest, reasonable attorneys' fees, expenses, costs to the extent allowable and any such further relief this court deems just and proper.

**FIFTH CAUSE OF ACTION**
**<u>BREACH OF IMPLIED CONTRACT</u>**

141.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all

preceding paragraphs as if fully set forth herein.

142.    To the extent that certain conditions of players' involvement in their school, conference and NCAA athletics activities cannot be shown to be governed by an express written contract, the facts also support an implied contract.

143.    Under the implied contract, student-athletes agreed to be governed by various regulations set forth by Defendants. Under this implied contract, Plaintiff and the putative class agreed to be bound by the regulations in order to participate in athletic competitions and other school and conference sponsored events under the implied warranty that said organizations would abide by their own by-laws.

144.    Plaintiff and the Class accepted the implied contract through their participation in athletic competitions and other activities sponsored by Defendants.

145.    Defendants breached the implied contract by failing to ensure that the athletic competitions and other activities were done with proper safety ensured for student-athlete participants.

146.    Defendants breached the implied contract by concealing or failing to properly disclose long term health risks associated with participation in athletic competitions and Defendant sponsored activities.

147.    Defendants breached the implied contract by failing to educate Plaintiff and other student-athletes on the symptoms of concussion related injuries.

148.    Defendants' breach caused Plaintiff and the Class to suffer physical injury and damages in the form of past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages. Further, Plaintiff and the Class will likely incur future damages caused by Defendants' breaches.

149.    As a result of their misconduct, Defendants are liable to Plaintiffs for all damages allowed under applicable law. Plaintiffs, individually and on behalf of the Class, seeks actual damages for Defendants' contractual breaches, as well as interest, reasonable attorneys' fees, expenses, costs to the extent allowable and any such further relief this court deems just and proper.

## SIXTH CAUSE OF ACTION
## UNJUST ENRICHMENT

150.    Plaintiff, on behalf of himself and the proposed class, repeats and realleges all preceding paragraphs as if fully set forth herein.

151.    Defendants receive significant revenues from the collegiate football played by student-athletes.

152.    In 2013, it is estimated that college football generated revenue in excess of $3.4 billion.[3] Since the introduction of the college football playoff system, the revenue total has grown substantially.

153.    Defendants have personal knowledge of this revenue and have profited from the college football program at Pittsburgh, where Plaintiff and the putative class have played.

154.    Under principles of equity and good conscience, Defendants should not be permitted to retain the profits they receive at the expense of Plaintiffs and the Class while refusing to pay for medical expenses incurred as a result of their unlawful actions or otherwise failing to prevent such injuries.

155.    Plaintiff, individually and on behalf of the Class, seeks restitution and/or disgorgement of all monies Defendants have unjustly received as a result of their conduct

---

[3] http://www.businessinsider.com/college-football-revenue-2014-12

alleged herein as well as any such further relief this court deems just and proper.

## REQUEST FOR RELIEF

156.    WHEREFORE, Plaintiff Joseph Delsardo individually and on behalf of the Class, requests that the Court enter an Order providing for the following relief:

(a)    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff as Class Representative, and appoint their counsel as Class Counsel;

(b)    Declare that Defendants' actions, as set out above, constitute negligence, fraudulent concealment, breach of contract, and unjust enrichment;

(c)    Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendants' conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and other damages;

(d)    Award Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

(e)    Award Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

(f)    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Class; and

(g)    Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

Dated: February 12, 2021

By:    /s/ _W. Steven Berman_
        W. Steven Berman; Pa Bar: 45927
        Hunter Shkolnik (*pro hac vice pending*)
        Salvatore C. Badala (*pro hac vice pending*)
        Napoli Shkolnik PLLC
        400 Broadhollow Road, Suite 305
        Melville, NY 11747
        (212) 397-1000
        wsberman@napolilaw.com
        hunter@napolilaw.com
        sbadala@napolilaw.com

        -and-

        Brittany Weiner (*pro hac vice pending*)
        Imbesi Law, P.C.
        450 Seventh Avenue, Suite 1408
        New York, New York 10123
        Telephone: (212) 736-0007
        brittany@lawicm.com